UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA            :

          - v. -                    :
                                         04 Cr. 186 (LAP)
DAWUD BARNES, et al.,               :

               Defendants.    :

- - - - - - - - - - - - - - - - - -X

REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANT TUERE BARNES' MOTION FOR A NEW TRIAL

ALEXANDER E. EISEMANN
Counsel for Defendant
   Tuere Barnes
20 Vesey Street, Suite 400
New York, New York 10007
(212) 420-8300

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA            :

          - v. -                    :
                                          04 Cr. 186 (LAP)
DAWUD BARNES, et al.,               :

              Defendants.    :

- - - - - - - - - - - - - - - - - -X

REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
<u>DEFENDANT TUERE BARNES' MOTION FOR A NEW TRIAL</u>

Defendant Tuere Barnes respectfully submits the following reply memorandum in further support of his motion for a new trial.

<u>DISCUSSION</u>

Despite the fact that the newly-discovered evidence directly contradicts both the letter and the spirit of crucial trial testimony of Bryan Conklin and Eddy Solano-Herrera, the government nevertheless contends, about the motion based on it, that:  "(a) it fails to establish that either Conklin or Solano-Herrera committed perjury, (b) the information, if used at trial, would have been cumulative, (c) the new information would not have changed the result at trial, and (d) the evidence was available before and during trial."  Gov't Mem. at 7-8.  Each of these contentions is unavailing.

A.   <u>Both Conklin and Solano-Herrera Committed Perjury</u>

The government makes a valiant effort to argue otherwise but there is no mistaking the fact that if the Muriqui declaration is credited, is establishes that both Conklin and Solano-Herrera committed perjury at Mr. Barnes' trial.  Both unequivocally testified that they hadn't spoken to each other in jail and Solano-Herrera reinforced that by adding that he still harbored animosity for Conklin during the entire time they had been held together.[1]  During cross examination, for example, Conklin flatly rejected defense counsel's suggestion that Conklin and Solano-Herrera had an opportunity to conform their testimony by discussing it in jail.  Indeed, Conklin denied have any conversations at all with Solano-Herrera, on any subject, while they were in jail together:

> Q.  And you also were in jail with the person we're calling Sosa, Solano-Herrera, right?
>
> A.  Yes.
>
> Q.  Was he in the same jail as you were?
>
> A.  Yes, he was.
>
> Q.  You did have a lot of contact with him in jail, right?
>
> A.  Yes.

---

[1]   The government correctly notes that Mr. Barnes' claim that it failed to disclose that Conklin and Solano-Hererra spent significant time together in the same facility was erroneous.  <u>See</u> Gov't Mem. at 4, 8, 11.  Counsel apologizes for the error, which occurred because of the very short time frame between counsel's re-appointment and the three-year deadline to file this motion, which had to be prepared without the benefit of a full review of the transcript of the 2009 trial.

Q.  <u>And you became friendly in jail, right</u>?

A.  <u>No</u>.

Q.  Q.  Once upon a time you had been friendly with him when you were using him as your supplier, right?

A.  I mean we weren't friends where we would sit and talk, it was just strictly business.

Q.  When you got to jail, though, you realized that you needed to mend fences with him because you were preparing a defense for this case, you needed to talk to him about this case, right?

A.  <u>I believe I never even spoke to Sosa at all</u>.

Tr. at 787-88 (emphasis added) (prosecutor's objection and court's overruling of it omitted).

On redirect, the government tried to dispel any notion that Conklin and Sosa had spoken while together in jail, much less attempted to conform their stories, driving home the idea that Conklin and Sosa had (according to Conklin) zero conversations during the entire time they were together:

Q.  Speaking of Sosa, Mr. Eisemann asked you some questions about some time that you spent in the same jail with Sosa.  Do you remember those questions?

A.  Yes.

Q.  How many times did you talk to Sosa when you and he were in the same jail?

A.  I can't remember at all that I -- where I spoke to him.

THE COURT:  Let me -- I just want to be clear.  When you say the same jail, you mean the same  building or the same cell?

THE WITNESS:  It was on the same unit. Same jail, it was the same unit.  Like in Valhalla has 44 cells; so, he was in a different cell but we was on the same unit.

-4-

THE COURT:  Thank you.

BY MR. HARBACH:

Q.   <u>How many conversations did you have with</u>
<u>Sosa</u>, Mr. Conklin, that you remember?

A.   <u>None</u>.

<u>Id</u>. at 1149-50 (emphasis added).

When Solano-Herrera testified, the government elicited
on direct, with an assist from the Court, that Solano-Herrera had
<u>never</u> spoken with Conklin, whom he knew as "Po," during their
entire time together in jail.  Solano-Herrera bolstered that
false testimony by reminding the jurors of the crime Conklin had
committed against him, testifying on direct that he wouldn't have
been friendly because of that:

Q.  Mr. Solano-Herrera, I wanted to ask you a few
more questions about the time period that you've been
in jail.  Okay?

Since you were arrested in April of 2004, during
the time that you've been in jail, have you seen any of
Li, Mark, Po or Big Wow in jail?

A.  Yes.

Q.  Have you spoken to any of them?

A.  Yes.

Q.  Who have you spoken to?

A.  With Po.

Q.  When did you speak to Po?

A.  About a month, more or less.

Q.  What jail were you in when you spoke to him?

A.  In Putnam County.

-5-

Q.  And when you say a month ago, you mean a month ago from today [May 5, 2009]?

A.  Yes.

Q.  What did you discuss with Po?

A.  He ask me a question if I knew when the trial was going to start.  So I told him that I didn't know. And I, in turn, ask him if he knew when the trial was going to start.

Q.  Besides –

A.  So he said no.  So I didn't talk to him anymore because of what he did to me.

Q.  Have you, apart from the conversation you've just described, had any other conversations with Po in jail?

A.  No.

Q.  Have you ever spoken to any of Li, Mark, Po or Big Wow about your testimony in this case?

A.  No.

Q.  A moment ago, when you said you didn't talk to Po anymore because of what he did to you, what were you referring to?

A.  When they tried to kidnap me, he was the one saying to them kill him, kill him.

. . . .

    MR. HARBACH:  No further questions, your Honor.  Thank you.

    THE COURT:  Let me just ask Mr. Solano-Herrera one question.

    You described a conversation you had with Po about a month ago; is that correct?

    THE WITNESS:  Yes.

    THE COURT:  When was the last conversation you had with Po before that conversation?

-6-

THE WITNESS:  <u>I didn't have any other</u>
<u>conversations with him</u>.

Tr. at 1849-51 (emphasis added).

The fundamental point both witnesses made in their
testimony was that they were not friendly at a time that the
newly-discovered evidence now flatly indicates they were.
Discussing his time in jail, Solano-Herrera testified about an
argument he had with a friend of Conklin and was then asked how
he felt about being in the same unit as Conklin and Mr. Barnes'
bother, Dawud (two participants in the alleged kidnaping in which
Solano-Herrera was the victim).  Fending off questions suggesting
that he had actually been comfortable being in a unit alongside
Conklin, Solano-Herrera deliberately tried to create the opposite
impression--now proven false--that he hadn't felt comfortable
about that at all:

> Q.  . . . .  [Y]ou never made a request to be
> moved off that unit, did you?
>
> A.  No, because I felt fine there.  One always has
> arguments in the jail.  That isn't a reason to ask to
> be moved.  But I know if my life is in danger, then I
> will ask to be moved.  But it was just an argument.
>
> Q.  So you were in the same unit with two people
> [Conklin and Dawud] who you say had tried to kill you
> in 2003, and you never made a request to be transferred
> out of that unit, right?
>
> A.  Later on, towards the end, I spoke with the
> government and told them that I wanted to be moved
> because <u>I didn't feel well with those people there</u>.
>
> Q.  When was that?
>
> A.  That was when I got moved to the other jail.
>
> Q.  What year was that?

-7-

     A.  In 2005.

Tr. at 1913 (emphasis added).

          In contrast to that crystal-clear and false contention

(1) that Conklin and Solano-Herrera never spoke and (2) were

never friendly the entire time they were together, is the newly-

discovered evidence provided by Muriqui, who states, under oath:

> . . . I have reviewed the testimony of Mr. Conklin
> in which he claimed he did not become friendly with Mr.
> Solano-Herrera while in jail with him and that he never
> spoke to Mr. Solano-Herrera while in jail with him.
> I've also reviewed the testimony of Mr. Solano-Herrera
> in which he claimed to have spoken to Mr. Conklin only
> one time while the two were in jail together, that this
> conversation took place only about a month before Mr.
> Barnes' trial and that he didn't speak to Mr. Conklin
> on any other occasions because he was upset about
> something that had happened between Mr. Conklin and Mr.
> Sosa before they were put in jail.
>
> All of the above testimony by Mr. Conklin and Mr.
> Solano-Herrera is completely false.  As I indicated, I
> was in the Putnam County Jail with both of them from
> late 2008 or early 2009 until July 2009. . . .
>
> During all the time we were actually together
> . . . , the two of them were part of a group of about
> seven inmates who played poker together almost every
> day, which included me as well.  The group, including
> both Mr. Conklin and Mr. Solano-Herrera all frequently
> played basketball together after the daily poker games
> ended. . . .
>
> Like everyone in the group, the two of them were
> very friendly and, for example, joked with [each] other
> during all our poker games.  I observed the two of them
> having these interactions for at least four or five
> months while we were all part of this group.  Although
> there were sometimes disagreements between other
> members of the group about, for example, claims they
> were cheating at poker, I never observed Mr. Conklin
> and Mr. Solano-Herrera have any disagreements over this
> or, to my knowledge, anything else either.

Declaration of Adhurim Muriqui, executed August 2, 2012, ¶¶ 3-6.

Thus, Muriqui statements contradict the matching testimonies of Conklin and Solano-Herrera in two key respects. First, he establishes that they spoke during a time they both testified they hadn't.  Second, he proves they were very friendly at a time when both testified they hadn't been.

**B.**   The Newly-Discovered Evidence Is Not Cumulative of the Evidence Presented at Trial and, if Presented During it, Would Have Produced a Different Result

The government has not disputed Mr. Barnes' contention that the jury acquitted him of all the racketeering acts in which Conklin's testimony wasn't corroborated by either Solano-Herrera or another cooperator, Giomar Diaz, a/k/a "Choco."  Yet, it still suggests, implicitly, that Conklin's testimony was sufficiently corroborated that the jury would have convicted Mr. Barnes of participating in the Solano-Herrera kidnaping, nonetheless, even if the jury had discounted Solano-Herrera's credibility.[2]

---

[2]

The purportedly new evidence would not have changed the result of the trial.  Despite the defendant's suggestion to the contrary, the evidence against him did not consist solely of Conklin and Solano-Herrera's testimony. (Def. Br. at 7.) Rather, their testimony was corroborated by audio tapes of the defendant discussing the kidnapping and documentary evidence, including phone records, that proved that the defendant was present during the attack on Solano-Herrera.  The jury had the opportunity to weigh this evidence against the defendant's own extensive testimony and documentary evidence introduced by the defendant to demonstrate that he was not present during the kidnapping.  In the end, the jury determined, based on the totality of the evidence, that the defendant participated in the kidnapping and attempted murder. As even the defendant concedes, the jury clearly reviewed the trial record for corroboration of the Government's cooperating witnesses. (Def. Br. at 5-7.) Here, the Government presented substantial evidence

Neither of these implicit arguments squares with the record, which contained substantial evidence casting doubt on the claim that Mr. Barnes a participant in the kidnaping.  Indeed, without the testimony of both Conklin and Solano-Herrera, there would not even have been probable cause to find that Mr. Barnes had participated.  Given how severely Conklin's credibility was damaged, it is highly likely that the jury relied upon the testimony of the supposedly independent Solano-Herrera to find that Mr. Barnes had been a participant.  Had the jurors known that both had become very friendly and spent much of their time in jail together socializing--and potentially conforming their stories--any independent value of Solano-Herrera's testimony would have been severely diminished.

> 1.   Conklin's Credibility Was Completely Destroyed
>      With Respect to His False Testimony That Mr.
>      <u>Barnes Had Taken Shots at Dean Graham</u>

One example of how extensively damaged Conklin's credibility was is his claim that Mr. Barnes had taken several shots at one of Conklin's enemies, Dean Graham.  The allegation was one of the racketeering acts in the indictment.  Conklin testified that he had been driving a rental car in Peekskill on the afternoon of December 16, 2003, between 2:00 and 3:00 p.m.,

---

corroborating its witnesses' testimony and the addition of [cumulative] impeachment evidence would not have changed the result.

Gov't Mem. at 10.

with Mr. Barnes in the right, front, passenger seat.[3]  When
Conklin spotted Graham driving another car, he testified, he
asked Mr. Barnes to hand him a pistol, which he claimed had been
sitting in "a little flip-out compartment . . . "[u]nderneath
where the radio and like the air conditioner and stuff is," Tr.
at 470, in the center of the console of Conklin's rented
Chevrolet Trailblazer, id. at 470-71.  In testimony that would
turn out to be of critical significance, Conklin said the
compartment at the bottom of the dashboard was hinged at the top
and flipped up when opened.  Id. at 902.

Conklin claimed Mr. Barnes got the gun out of the
closed compartment but instead of handing it to Conklin, Mr.
Barnes surprised him by reaching across Conklin and taking four
or five shots at Graham himself sticking the gun out of Conklin's
driver's side window.  Id. at 472.  After the attempted shooting
(Graham wasn't hit by any shots), Conklin testified about an
elaborate story of how he and Mr. Barnes spent the rest of the
afternoon together, cleaning out the spent shells from the car,
id. at 475, then swapping cars with another conspirator, Bobby
Gonzalez, who had Conklin's brother's truck, id. 474, so Conklin
could drive home in a car that couldn't be identified as having
been involved in anything.  (Conklin said he didn't tell Gonzalez
that the rented car had been involved in a shooting or that he

---

[3]      The date and time of the Graham shooting were
established by police reports documenting the sounds of shots
fired and of the coincidental arrest of a drug dealer, Jevon
O'Field, at the scene immediately after the attempted shooting.
See Tr. at 1334-35.

and Mr. Barnes had hidden the gun in the car that the Gonzalez
would be driving after getting off his shift at the local A&P
Supermarket.  Id. at 477-78.

Conklin's story about what happened after the attempted
Graham shooting was rich on detail that, eventually, was
thoroughly discredited with irrefutable proof.  For example, as
noted above, Conklin claimed he and Mr. Barnes went together to
meet Gonzalez at his job at an A&P supermarket to swap cars for
Conklin's brother's truck.  Id. 474, 476.  Then, he explained, he
and Mr. Barnes drove in two cars to Conklin's brother's job, so
Conklin could drop off his brother's truck at his brother's
workplace.  He said he arrived at his brother's job around 3:30
in the afternoon.  Id. at 1025-26.  Then, according to Conklin,
he spent the rest of the afternoon driving around in Mr. Barnes'
van selling crack.  Id. at 479.

Conklin said Gonzalez dropped the rented car off at
Conklin's house later that night.  Id. at 894-95.  He said he and
his wife returned the car to Enterprise Car Rentals the following
day.  Id. at 480-81, 906.  Conklin insisted he had a strong
recollection of all of the events of that day in all their
detail.  Id. at 891-92.  He said he had "no doubt" that Mr.
Barnes had spent the rest of the day selling crack with him,
another gratuitous (and false) embellishment.  Id. at 893.  He
even claimed to have had a strong recollection of seeing the
rented car sitting in his own garage later in the evening of the
day of the attempted shooting.  Id. at 895.

-12-

Conklin denied telling two women, Cheddie Ann Williams and April Eichler and a man named Marcus Shelton that it was he who had shot at Graham.  Id. at 909-11.  Nevertheless, Williams too the stand and contradicted him, testifying that he had, in fact, told her it was he who had shot at Graham.  Id. at 2668-69, 2672, 2681, 2689.  Eichler similarly testified that Conklin said about Graham:  "That's why I got at him."  Id. at 2718.  Shelton testified that Conklin also told him that he was the one who had taken the shots at Graham.  Id. at 2776.

Jevon O'Field a/k/a Oaf Nights, a drug dealer, was arrested right at the scene of the attempted shooting (on suspicion of being involved in it) as an unfortunate result of simply being at the wrong place at the wrong time.  Tr. at 902-03.  He testified that he knew both Conklin and Graham.  Tr. at 2479.  He said happened to be on the street at the moment that the shots were fired at Graham and saw everything that happened.  Id. at 2479-80, 2484.  He said he saw Conklin driving a car by himself and then raising his hand and shooting a gun at Graham.  Id. at 2489-90, 2494-95.  He was only about seven or eight feet from Conklin's car and saw Conklin's face clearly.  Id. at 2491-92.

Conklin was confronted with business-record rental receipts from Enterprise Rental Cars, which were introduced in evidence.  Contrary to the tale he had spun about swapping cars with Gonzalez, driving his brother's truck home, seeing the rental car in his own garage that night, the Enterprise records,

-13-

augmented by a representative of the company, indisputably showed that Conklin had returned the Enterprise car shortly after the shooting, at 4:20 p.m.  Id. at 963-65, 2336.  Despite his fanciful tale about cleaning up the car, hiding it and spending the rest of the day with Mr. Barnes and keeping the car overnight, Conklin was forced to concede that this was the actual time and date of the car's return.  Id. at 965-66.  Caught in a lie, Conklin's face turned red as he struggled to justify the elaborate story he had apparently made up.  See id. at 3600-01, 3610.  He unconvincingly tried doing that during cross examination as follows:

> Q.   You testified several times in direct and cross examination here that after the shots were fired at Dean Graham, that you took the car, the TrailBlazer, to Bobby Gonzales, right?
>
> A.   Yes, I did.
>
> Q.   You recalled that happened at the Croton A&P?
>
> A.   Yes.
>
> Q.   And you said you had a strong recollection of that, right?
>
> A.   Yes, for sure.
>
> Q.   Okay.  Did you have two Chevy TrailBlazers that day?
>
> A.   No, I did not.
>
> Q.   The records [here] indicate that --
>
> THE COURT:  A Chevy TrailBlazer.
>
> Q.   -- a Chevy TrailBlazer was returned on December 16, 4:20 p.m., right?
>
> A.   That's what the paper says, yes.

-14-

Q.   That's only a couple of hours after Dean
Graham, the shots were fired at Dean Graham, right?

A.   Yes.

Q.   So, did you drop off the Chevy TrailBlazer at
Enterprise at 4:20 p.m. that day or did you drop the
TrailBlazer off at Bobby Gonzalez' job at the Croton
A&P that day?

A.   I dropped it off at Bobby Gonzalez' job.

Q.   So this record is wrong?

THE WITNESS:  I just know that I brought the
TrailBlazer to Bobby Gonzalez' job.  I don't know about
this record, but I know what I did.

Tr. at 966-68 (non-pertinent colloquy omitted).

Despite that weak attempt to cling to his story about
dropping the car off with Bobby Gonzalez, business records from
A&P Supermarkets, Gonzalez's employer, put another nail in
Conklin's coffin because they indisputably established that
Gonzalez hadn't worked on the day of the Graham Shooting.  DX
RRRR; Tr. at 3338.  Phone records in evidence also reflected
Conklin's otherwise active telephone being inactive for about a
half hour from 3:56 p.m. until 4:31 p.m., the very period in
which the Enterprise car was being returned.  Id. at 1007-08.
Conklin, however, wouldn't budge from his story.  Id. at 1008,
1180-81.

Pressed, on cross examination, why he had to ask Mr.
Barnes to hand him the gun instead of picking it himself, Conklin
had insisted he wouldn't have been able to reach it easily
because it was in that closed compartment in the center of the
car at the bottom of the dashboard.  Id. at 1017-18.  He was very

-15-

specific in describing where the closed compartment was located, explaining that he would have had to reach way down to the bottom of the dashboard to get it himself.  <u>Id</u>.

While the representative of Enterprise was on the stand, he provided the vehicle identification number of the car Conklin had rented.  <u>Id</u>. at 2328-29.  Using that information, the defense located the current owner of the vehicle, whose daughter had purchased it from Enterprise a few months after the Graham incident, and who provided photographs of its interior.  <u>See</u> Tr. at 3334-35.  They belied Conklin's testimony because they showed that the car did not have a closed compartment from which Conklin falsely testified he needed Mr. Barnes' assistance to retrieve the gun.  <u>See</u> Tr. at 3607.  A parts manager for a Chevrolet dealership examined the photographs provided by the new owner, <u>id</u>. at 3336, 3336.  In a testimonial stipulation, he stated that "No Trailblazer has ever had a closed storage compartment located under the center of the dashboard."  DX QQQQ; Tr. at 3337.

Records from the Westchester Community College also showed that Mr. Barnes had been taking a final examination in one of his classes on the afternoon of the Graham shooting, which had taken place between 2:00 and 3:00 p.m.  Tr. at 2479-80.  The school's Associate Dean of Academic Affairs and Division Dean for Arts and Humanities, <u>id</u>. at 2586, testified that the examination took place between 3:15 p.m. and 5:15 p.m., <u>id</u>. at 2592.  Reviewing school records in evidence, the Dean testified that Mr. Barnes had attended the class that semester, <u>id</u>. at 2598, and

taken the final examination at this date and time, id. at 2602-04; DX WWW.

There were other instances in the trial in which irrefutable evidence and unimpeached testimony flatly contradicted Conklin's story, but this is perhaps the best example, so Mr. Barnes will not take the Court painstakingly through other examples as he has in this instance.  Briefly, however, Conklin's outrageous claim that Mr. Barnes had admitted being involved in a shootout with an individual named Christian Gilchrist--who had killed his own girlfriend and concocted a cover story about doing that by accident while in a supposed shootout with Mr. Barnes--was belied by the ballistics evidence the irrefutably proved that the only shots fired were from the gun of Gilchrist (Gilchrist admitted shooting the girlfriend). The false story was similarly discredited by testimony about the lack of any gunshot sounds from the area from which Mr. Barnes was supposedly shooting at Gilchrist.  This was provided by an independent next door neighbor who, quite fortuitously, happened to be an audio engineer.  See Tr. at 3593-96.

> 2.   The Evidence at Trial Already Contained Some Doubt
>      About Mr. Barnes' Alleged Involvement in the
>      Solano-Herrera Kidnaping

Conklin told a similarly elaborate story about events on the date of the Solano-Herrera kidnaping, which took place in the early afternoon of November 24, 2003, in the Bronx. Essentially, he claimed that he and other conspirators, including Mr. Barnes, met twice at the Mohegan Lake record store of his

brother, Khalid Barnes, which was called "Big Beats," to plan and then assemble for the kidnaping.  Tr. at 277, 327, 329.

Big Beats, however, had been shut down in a police raid long before the time that Conklin claimed these, which he simply made up, were taking place.  For example, the property manager of the building (the wife of the building's owner) where Big Beats was located testified that her office was right next door to it.  Id. at 2435, 2439.  She said the police had shut down the record store and she figured the tenants would never be returning.  Id. at 2440-41.  About a month or less after that, she put a "for rent" sign in its front window and went in to repair the walls, where the removed shelving had left lots of holes.  Id. at 2441-42.  She saw CD's on the walls and in boxes, which she boxed up.  Id. at 2442.  After the store closed, she never the owners or employees of the store again and never saw anyone enter the store either (besides her husband and individuals they had directed to enter it).  Id. at 2443.

The bookkeeper/secretary of the owner testified that she worked in the office next to Big Beats from 8:00 a.m. to 2:00 p.m.  Id. at 2450-51.  She remembered that the police had closed the store down in October 2003.  Id. at 2457-58.  There was not much traffic at that building, so she usually noticed people going by the walk just outside her office window.  Id. at 2459, 2472-73.  Although she wasn't always sitting at it, while seated at her desk, she could see anyone who was heading in the direction of Big Beats.  Id. at 2467, 2469, 2471-72.  She didn't

see anyone heading in direction after the police shut it down, however.  Id. at 2459-60.

Finally, representatives of Consolidated Edison testified that there was only a minuscule amount of electricity usage at Big Beats during the period in which Conklin claimed the record store was still functioning and when, he claimed, the kidnaping planning meetings took place.  Id. at 2360-62, 2367, 2710.

Aside from these provable falsehoods about how the kidnaping plot unfolded, Mr. Barnes had a partial alibi for that day.  He was a student at Westchester Community College and had two classes that day.  One, College Success, taught by Professor Liebowitz, ran from 11:00 a.m. to 11:50 a.m., DX EEE-4, DX EEE-5; see DX EEE-9, EEE-10, EEE-11.  A second, Basic Writing, taught by Professor Naqvi, ran from 2:00 p.m. to 3:00 p.m.  DX EEE-4; see DX EEE-1, EEE-2, EEE-3.[4]  There was significant documentary evidence that Mr. Barnes had attended his morning class with Professor Leibowitz from 11:00 a.m. to 11:50 a.m. on November 24, 2003, the date of the Solano-Herrera kidnaping.  DX  DX EEE-9, EEE-10, EEE-11; see Tr. at 3202, 3624-25.[5]

---

[4]    Pertinent excepts of DX EEE are attached for the Court's convenience, as is a key to interpreting them that was also introduced in evidence as DX XXX.

[5]    The week numbers running horizontally across the tops of the attendance sheets in DX EEE correspond to the week numbers running vertically down the key.  Tr. at 2609.  Monday, November 24, 2003, falls in week 13.  Black marks on the "bubble sheets" contained in DX EEE indicate absences.  Tr. at 2407, 2608-09; DX XXX.  Therefore, the absence of any black marks on DX EEE 11 for week 13 means Mr. Barnes attended each of his three College

Although Mr. Barnes was also registered for the afternoon class with Professor Naqvi, DX EEE-4, EEE-5, for some reason that she could not explain, he did not appear on her bubble-sheet attendance form. <u>See</u> Tr. 2427-28; DX EEE-1, EEE-2, EEE-3. Nevertheless, she testified that Mr. Barnes had attended and participated in her class that semester, based on grading marks and comments she had put on assignments completed by him, which were also admitted in evidence. <u>Id</u>. at 2419-22. Unfortunately, Professor Naqvi had long-ago discarded her actual attendance records, <u>id</u>. at 2313-32, the most reliable record of attendance, so she could not state, specifically, whether Mr. Barnes had been in her class on November 24, 2003. <u>Id</u>. at 2329-30. She said there were no copies of them, so they couldn't be reconstructed. <u>Id</u>. at 2432. A fellow student testified, however, that Mr. Barnes regularly attended that class, <u>id</u>. at 2621-22, and in his own testimony, Mr. Barnes said he had attended both of his classes that day, Tr. at 3201-03.

Defense counsel summed up some of the inconsistencies between Conklin's elaborate story, the landlord's representatives, the Con Ed witnesses and Mr. Barnes' school as follows:

> [Mr. Barnes] [n]ever was at Big Beats. You heard testimony about that, about the electricity usage. It's nice to trivialize it and make it look like that's a distraction. But Bryan Conklin told you there was a meeting to plan this thing in Big Beats. He went in the front door. None of this happened I submit to you.

---

Success classes that week (Monday, Tuesday and Friday, as signified by the vertical columns headed "M," "T," and "F").

He's talking about that there were things on the -- CDs
all over the place where you heard from Ms. Catucci,
who was the landlord's wife or she worked in the
company that she boxed the things up.  She did that
within days of the October 17th, 2003 raid of Big
Beats.  So by November 24th there was no store to go
to, there was nobody going to Big Beats.  The Con Ed
records showed that that usage dropped to a hundred
watt light bulb 24 hours a day.  There's phone records
showing no phone calls made from the landline phone at
Big Beats.

    Why is that important?  That kidnapping could have
taken place if the meeting took place someplace else,
if there was a meeting.  But the point is that to try
to bring in Tuere, Bryan [Conklin] tells a story that
says we met in Big Beats which is in Peekskill.  He
probably didn't know that Tuere had class that day.
There's evidence there that he had another class, we
didn't talk about it, but the records are there, a
class that starts at eleven that day.  So Bryan is
saying that there's a meeting that starts around noon,
he doesn't know because he hasn't gotten to the
educational records as to what Tuere's classes he's
taking, he doesn't know that Tuere is down in Valhalla,
which is 40 minutes away, half hour a way from
Peekskill, so he puts the meeting at twelve.  I'll make
a meeting at Big Beats at twelve and we'll go down to
Tuere's house at Yonkers, we'll wait for Khalid to get
the guns and we'll go to this place in the Bronx and
kidnap Sosa.

    That's a lot of things to be done in that short
period of time.  If Tuere is in class, the early class,
how does Tuere get there in time for there to be a
meeting, discussion, driving down to Tuere's house,
waiting for Khalid to come with the guns and get that
all done by whatever time.

Tr. at 3592-93 (defense summation).  About the lack of conclusive

proof that he had attended the afternoon class, which would have

given him an air-tight alibi, counsel took a realistic view of

it, suggesting that it was part of the reasonable-doubt analysis:

Would you want to bank your life on the fact that he
was in class that day?  No.  But is it evidence you
should consider in deciding whether or not there was
reasonable doubt?  Yes, you should.  It would be nice
if this were indicted three or four years earlier and

we'd have those records, but we don't.  Tuere did the
best he could trying to get the proof and he gave you
everything he had for you to consider.

Tr. at 3626.

There were plenty of other inconsistencies and
weaknesses in the claim that Mr. Barnes had participated in the
Solano-Herrera kidnaping.  Rather than repeat them here, counsel
respectfully refers the Court to the portion of the defense
summation covering it.  <u>See</u> Tr. at 3624-29, 3632-39.  The point
is that these demonstrable weaknesses through this documentary
and other unimpeachable evidence establishes how critical the
supposed independence of the Solano-Herrera testimony had to be
to the jury.[6]

---

[6]     There is another reason to believe that the jury did
not credit Conklin.  During deliberations, it did not base its
weight findings on the very large quantities that could easily
have been drawn from Conklin's testimony.  Instead, it requested
the testimony of Mr. Barnes' supplier, another cooperator named
Giomar Diaz, a/k/a "Choco."  <u>See</u> Tr. at 3856 ("Your Honor, please
provide us with Choco's testimony, amounts and types of narcotics
he sold to Rey [Tuere Barnes] and/or Bryan [Conklin] or any other
individual.").  That would not have been necessary if it had
relied on Conklin for this.  <u>See</u> Tr. at 100 (Conklin discussing
how much marijuana he and Mr. Barnes sold in 1997, "I'll say
maybe an ounce to two ounces at the most a week."); <u>id.</u> at 192
(discussing how often he and Mr. Barnes purchased 200- or 300-
gram quantities of crack cocaine during Spring 1999, "It always
varies like on how good of a week you had.  But on the average,
it would be like at least once a week."); Tr. at 194 (discussing
how much Mr. Barnes and he discussed purchasing at a time, "200,
300 grams every trip"); <u>id.</u> at 205 (discussing how often he or
Mr. Barnes would visit Giomar Diaz, a/k/a "Choco" to buy crack
between December 1999 and June 2001, "300 grams.  400.  500
grams. . . .  like every seven to ten days"); Tr. at 279, 281-82
(discussing how much crack cocaine Mr. Barnes' brother, Khalid,
had given him to sell for an average twelve-hour shift,
"[b]etween like 80 and a hundred grams.").

C.    <u>The Government's Other Arguments are Not Persuasive</u>

The government takes an artificially "objective" view of the value of the newly-discovered evidence:

> Although Barnes's lawyer asked Conklin about playing basketball with others involved in the defendant's offense, neither Conklin nor Solano-Herrera was asked or testified about whether they played basketball or poker with each other.  Therefore, Muriqui's claim that they did does not suggest either witness perjured themselves. Finally, while Muriqui's statement that Conklin and Solano-Herrera played games together and were friendly would undercut the witnesses' testimony that they were not friendly with each other and did not regularly speak with each other, Muriqui's claim stands in stark contrast to the evidence presented trial.  That evidence established that Conklin and the defendant kidnapped and attempted to murder Solano-Herrera and that Solano-Herrera only survived to testify against Barnes because he jumped out of a moving car. Muriqui's Affidavit does not contest that, in fact, Conklin participated in that violent offense. It strains credulity to believe that, following such an incident, Solano-Herrera would become friendly with Conklin.

Gov't Mem. at 8.[7]

To make that assessment, a trier of fact--or the Court--would have to hear from Muriqui.  All the government's arguments about why Muriqui's statement wouldn't make sense given the one-time animosity between Conklin and Solano-Herrera simply beg the question of whether these one-time enemies could

_____

[7]    The government's citation to Solano-Herrera's claim, during cross examination, that "he could not understand English speakers," Gov't Mem. at 5 (citing Tr. at 1914, doesn't help its case.  It seems fairly obvious that Solano-Herrera made that dubious claim in a transparent attempt to bolster his false testimony that he had never spoken to Conklin in jail.  Yet, he contradicted that claim when he described, for example, what the English-speaking kidnapers were saying when he had him in their car.  Tr. at 1827 ("He was telling Big Wow [Dawud Barnes] to kill me since I didn't want to talk.  He was gesturing to him and telling him kill him, kill him, things like that.").

-23-

nevertheless forge an alliance when it served both of their

interests to get out of jail as soon as possible.  For example,

it argues:

> The new information about Conklin and
> Solano-Herrera was merely cumulative of information
> that the defendant had at the time of trial. The
> defendant clearly knew that Conklin and Solano-Herrera
> had been housed together in a unit within the Putnam
> County jail for an extended period of time. He asked
> both witnesses whether they were housed with each other
> and they both admitted that they were. He also asked
> them how long they had been housed together and Conklin
> testified that they were together approximately one
> year and Solano-Herrera said he could not remember but
> it was at least a month.  Accordingly, information from
> Muriqui that Conklin and Solano-Herrera were housed for
> a period of time with each other would have been merely
> cumulative. In fact, this information could not be used
> to effectively impeach either witness as they both
> effectively acknowledged what Muriqui said was true.

Gov't Mem. at 8-9.  Yet, as proven above,

> In classic tautological reasoning, the government also

argues:

> Moreover, in his brief, the defendant claims that
> he demonstrated at trial that Conklin's testimony was
> not to be believed and that the jury, in fact,
> disregarded it. (Def. Br. at 5-6, 6 nol, and 8.)  Thus,
> even by the defendant's own account, further evidence
> attacking Conklin's credibility would clearly have
> added little if anything to the defendant's
> presentation.  "Since [Muriqui's] testimony would have
> been admissible only for the purpose of showing that
> [Conklin and Solano-Herrera] lied about [whether they
> were friendly], a collateral fact that would simply
> affect the general credibility of [them] and was not
> evidence that [they were] lying as to a particular fact
> about the crime, the evidence was cumulative to other
> evidence of collateral matters that focused on [their]
> credibility."  United States v. White, 972 Fold at 21;
> see also United States v. Wong, 78 F.3d 73,82 (2d Cir.
> 1996) (where additional impeachment material goes to
> collateral issue, it is not sufficiently material to
> warrant a new trial).

Gov't Mem. at 9-10 (emphasis added).  The government can try to characterize the ability of witnesses to collude about the very facts about which they testified as "collateral" but it doesn't make it true.  Facts that tend to establish a witness's bias or interest are never collateral and can be proven with extrinsic evidence.  See United States v. Abel, 469 U.S. 45, 52, 105 S. Ct. 465, 469 (1984).

        This argument ignores the reality that, in the end, the jury could not convict defendant of participating in the kidnaping without finding Conklin and/or Solano-Herrera credible. As suggested above, the only other evidence, cell phone records, did not place defendant at the scene and were also explained by defendant on the stand.  (He said he had received a call for help from his brother Dawud who needed a car service to pick him up from the Bronx from some unexplained incident).

    D.   The Newly-Discovered Evidence Could Not
         Reasonably Have Been Discovered Prior to Trial

        Finally, the suggestion that defense counsel could have discovered the social relationship between Conklin and Solano-Herrera prior to trial is absurd.  Here, the government claims:

        The defendant's counsel was certainly free to
        interview other inmates who were housed in jail with
        the Government's witnesses both before and during
        trial.

Gov't Mem. at 11.

        One might reasonably asked who the defense would have interviewed?  Every inmate who had been in any facility with these two individuals over a several-year period?  Perhaps the

Court would have authorized hundreds of hours or investigator time to spend weeks at the jail to unearth and then and to try to convince inmates, represented by counsel, to talk to them but, realistically, no judge would approve such a potentially wasteful use of CJA funds--assuming counsel would even know where to begin on this enormous undertaking.

It is an absurd proposition that simply because witnesses exist, a defendant can discover them and present their testimony at trial.  Taken to its logical extreme, the government's position would mean that no new witness with knowledge of the underlying facts could ever provide a basis for an order for a new trial because, theoretically, with unlimited time and resources, every single person in a community or maybe even the world could be interviewed and their testimony discovered prior to trial.  That would be an unreachable standard if it applied and the government cites no cases trying to argue that it really does and for good reason--because it could not.

<u>CONCLUSION</u>

Therefore, for the reasons stated above and in his original papers, defendant Tuere Barnes respectfully requests that the Court grant his motion for a new trial and that it also grant such other and further relief as it deems just and proper.

Dated:   New York, New York
         September 27, 2012


                         Respectfully submitted,



                         _____
                         ALEXANDER E. EISEMANN
                         Counsel for Defendant
                            Tuere Barnes
                         20 Vesey Street, Suite 400
                         New York, New York 10007
                         (212) 420-8300